**UNITED STATES DISTRICT COURT**

**DISTRICT OF ALASKA**

| | | |
|---|---|---|
| DOYON DRILLING, INC. | ) | |
| | ) | |
| Plaintiff, | ) | 3:10-cv-00094 JWS |
| | ) | |
| vs. | ) | ORDER AND OPINION |
| | ) | |
| LOADMASTER ENGINEERING, INC., | ) | [Re:  Motion at Docket 27] |
| LOADMASTER UNIVERSAL RIGS, | ) | |
| INC., ROGER M. BARNES, and | ) | |
| ROBERT R. CUDDIE. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.  MOTION PRESENTED

At docket 27, defendants Loadmaster Universal Rigs, Inc. ("Loadmaster Universal"), Roger M. Barnes ("Barnes"), and Robert R. Cuddie ("Cuddie") move to dismiss the case pursuant to Federal Rule 12(b)(2) for lack of personal jurisdiction. Plaintiff Doyon Drilling, Inc. ("Doyon") opposes the motion at docket 33.  Defendants' reply is at docket 43.  Oral argument was not requested and would not assist the court.

## II.  BACKGROUND

Doyon is an Alaska corporation that performs oil and gas drilling.  Loadmaster Universal is a Texas corporation, with offices in Houston and Beijing, that does engineering and design work.  In 2008, Loadmaster Engineering, Inc. ("Loadmaster Engineering"), a Texas corporation that shares an address and employees with

Loadmaster Universal, entered into a contract ("Technical Services Agreement") with Doyon.  Under the contract, Loadmaster Engineering–and allegedly Loadmaster Universal–agreed to provide Doyon with engineering, design, and support services for the construction of an oil rig that was to be operated on Alaska's North Slope.  The rig was to be "state of the art" and was known as Rig 25.[1]

Barnes is the president of Loadmaster Engineering and a shareholder of Loadmaster Universal.  Cuddie was formerly the vice president and a shareholder of Loadmaster Engineering, and a former officer and shareholder of Loadmaster Universal.  Doyon alleges that the Loadmaster entities were unable to meet the project's aggressive schedule, despite assurances to the contrary, resulting in delays and "massively increased" costs.[2]  Doyon also contends that the Loadmaster entities misrepresented their progress and that their work product was deficient.  Doyon has asserted claims for negligence, fraud in the inducement, fraudulent misrepresentation, violation of the Alaska Consumer Protection Act, and in the alternative, breach of contract and breach of express warranty.  Doyon named Loadmaster Engineering, Loadmaster Universal, Cuddie, and Barnes as defendants to all claims, except its breach of contract and warranty claims, which are asserted against Loadmaster Engineering and Loadmaster Universal only.

## III.  STANDARD OF REVIEW

"Where a defendant moves to dismiss a complaint [pursuant to Federal Rule of Civil Procedure 12(b)(2),] for lack of personal jurisdiction, the plaintiff bears the burden of establishing that a court has personal jurisdiction over a defendant."[3]  Where the motion is based only upon written materials, rather than an evidentiary hearing, the

---

[1]Doc. 12 ¶ 11.

[2]*Id.* ¶ 29.

[3]*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

-2-

plaintiff is required only to make a prima facie showing of personal jurisdiction.[4] Uncontroverted allegations in the complaint are taken as true, and conflicts between parties over statements contained in affidavits are resolved in favor of the plaintiff.[5]

"Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits."[6] Alaska's long-arm statute authorizes the exercise of jurisdiction to the extent permitted by federal due process requirements.[7] Due process requires that the defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[8]

## IV. DISCUSSION

### A. Loadmaster Universal is Subject to Specific Jurisdiction

Specific jurisdiction describes personal jurisdiction over a defendant where the plaintiff asserts claims related to the defendant's contacts with the forum. Specific jurisdiction "exists if (1) the defendant has performed some act or consummated some transaction within the forum or otherwise purposefully availed himself of the privileges of conducting activities in the forum, (2) the claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable."[9]

---

[4] *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002).

[5] *Brayton Purcell LLP v. Recordon & Recordon*, 575 F.3d 981, 985 (9th Cir. 2009).

[6] *Fred Martin Motor Co.*, 374 F.3d at 800.

[7] *Volkswagenwerk, A.G. v. Klippen, GmbH*, 611 P.2d 498, 500 (Alaska 1980).

[8] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations omitted).

[9] *Bancroft*, 223 F.3d at 1086.

-3-

**1. Loadmaster Universal Has Purposefully Availed Itself of Alaska's Jurisdiction**

With respect to the first prong, the Ninth Circuit has "typically treated 'purposeful availment' somewhat differently in tort and contract cases."[10]  In tort cases, the question is generally "whether a defendant 'purposefully directs his activities' at the forum state" and courts apply "an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum."[11]  The effects test was first announced by the Supreme Court in *Calder v. Jones*.[12]  The Ninth Circuit has construed the *Calder* test to comprise three prongs: "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."[13]

Doyon asserts tort claims against Loadmaster Universal based on the alleged submission of negligent work, misrepresentations regarding its ability to perform, and false invoices.  By definition, negligent acts cannot satisfy the *Calder* test.  However, it is clear that Loadmaster Universal purposefully availed itself of personal jurisdiction in Alaska through intentional submission of drawings, reports, and confusing invoices.

One such invoice indicated that payment was owed to Loadmaster Engineering.[14]  The address provided on that invoice was the same address used for Loadmaster Universal in e-mail correspondence during negotiation of the Technical Services Agreement.[15]  More importantly, the Job Number used on that invoice–"6041"–corresponds to a "Loadmaster Universal Rigs Job #" provided in a

---

[10] *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).

[11] *Id.*

[12] 465 U.S. 783, 789–90 (1984).

[13] *Yahoo!*, 433 F.3d at 1206.

[14] Doc. 33-6 at 17.

[15] *Compare* doc. 33-7 at 2, *with id.* at 17.

-4-

separate electronic delivery of .pdf drawings.[16]  The latter transmittal contained a request that Doyon send confirmation of receipt to Loadmaster Universal.  Moreover, a report provided to Doyon was composed on Loadmaster Universal letterhead and listed the same job number (6041), but included "Loadmaster Engineering, Inc." in the footer and signature box.[17]

Doyon has also alleged that numerous misrepresentations were made on behalf of both Loadmaster entities.[18]  Doyon maintains that "[a]t no time . . . did Loadmaster ever represent itself as two entities . . . [r]ather, it always portrayed itself as one entity–Loadmaster."[19]  This contention is adequately supported by the record.  Therefore, any misrepresentations made on behalf of Loadmaster Engineering would also constitute misrepresentations on behalf of Loadmaster Universal.

Even though it is not uncommon for two separate businesses to share an address, interchangeable use of separate entities' names is rare.  Resolving factual conflicts in Doyon's favor, Loadmaster Universal committed intentional acts expressly aimed at Alaska by submitting invoices, reports, and drawings to Doyon and through the misrepresentations of its representatives.  If Loadmaster Universal's invoices were false, its reports inaccurate, or its drawings deficient, Loadmaster Universal would have known that Doyon would be likely to suffer injury in Alaska. The *Calder* effects test is met, and Doyon has established purposeful availment in the context of its tort claims against Loadmaster Universal.

Doyon need not establish personal jurisdiction over Loadmaster Universal for each of its claims.  Nonetheless, to satisfy defendants' concern that Doyon's case actually sounds in contract, and because Doyon's breach-of-contract claim was pled in the alternative, the court will examine purposeful availment in the context of Doyon's contract claims.  In contract cases, courts in the Ninth Circuit consider "whether a

---

[16]*Compare* doc. 33-6 at 17, *with* doc. 33-7 at 15.

[17]Doc. 33-7 at 17.

[18]Doc. 12 ¶¶ 11–19; doc. 33 at 7.

[19]Doc. 33 at 4.

-5-

defendant 'purposefully avails itself of the privilege of conducting activities' or 'consummates a transaction' in the forum, focusing on activities such as delivering goods or executing a contract."[20]

Defendants characterize Doyon's claims as arising out of its contract with Loadmaster Engineering, but Doyon has made persuasive arguments that Loadmaster Engineering and Loadmaster Universal were held out as a single entity and acted in concert. Of particular import are a series of e-mails exchanged prior to the consummation of the Technical Services Agreement.

Correspondence between Barnes, Wilson, and Luis Suarez ("Suarez"), a Loadmaster employee, lends further support to the notion that Loadmaster Engineering and Loadmaster Universal functioned as a single entity and supports the exercise of specific jurisdiction over Loadmaster Universal. Suarez's e-mail address contained a "loadmastereng.com" domain name, but his signature box listed Loadmaster Universal as his employer and displayed the Loadmaster Universal website.[21] Several e-mails with those characteristics were sent during negotiation of the Technical Services Agreement.[22] Loadmaster Universal's role in negotiating an agreement with Doyon is apparent.

Loadmaster Universal had other contacts with Alaska after performance of the agreement had begun. One report, mentioned above, was written by an Engineering Manager at Loadmaster Engineering. That report was on Loadmaster Universal letterhead.[23] The electronic delivery of .pdf drawings also referenced above lists that same Engineering Manager as an employee of Loadmaster Universal.[24] The document

---

[20] *Yahoo!*, 433 F.3d at 1206.

[21] *E.g.,* doc. 33-6 at 2.

[22] *See id.* at 2–9.

[23] Doc. 33-7 at 17.

[24] *Id.* at 15.

uses Loadmaster Engineering and Loadmaster Universal interchangeably.[25]  Even though Doyon's contract was formally with Loadmaster Engineering, it is clear that Loadmaster Universal played a role in performing and administering it.  The inclusion of Loadmaster Universal's title in several e-mails, reports, and invoices pertaining to Loadmaster Engineering's contract with Doyon are indicative of Loadmaster Universal's purposeful availment in the performance and maintenance of that contract and, consequently, personal jurisdiction in Alaska.

### 2. Doyon's Claims Arise out of Loadmaster Universal's Purposeful Availment

The second prong of the specific jurisdiction inquiry requires that a plaintiff's claim arise out of the defendant's purposefully availing contacts.  Loadmaster Universal's purposefully availing acts consist of submissions to Doyon, alleged misrepresentations, and voluntary interjection into the negotiation, maintenance, and performance of various aspects of the Technical Services Agreement.  Doyon's fraud in the inducement and fraudulent misrepresentation claims arise out of the former availing acts.  Doyon's alternatively pled breach-of-contract claim arises out of the latter.  Because Doyon's claims arise out of Loadmaster Universal's purposefully availing acts, the second prong of the *Bancroft* inquiry is met.

### 3. The Exercise of Jurisdiction Over Loadmaster Universal Is Not Unreasonable

Finally, the exercise of jurisdiction must be reasonable.  The only reasonableness argument that defendants make specific to Loadmaster Universal is that "the Complaint does not allege any conduct by [Loadmaster Universal] whatsoever" and "baseless[ly]" alleges that Loadmaster Universal and Loadmaster Engineering are the same company.  This argument has been adequately addressed by the discussion above.  Loadmaster Universal was involved in the negotiation and maintenance of Loadmaster Engineering's contract with Doyon.  The exercise of jurisdiction over

---

[25]*Id.*

-7-

Loadmaster Engineering is not unreasonable, nor is the exercise of jurisdiction over Loadmaster Universal.

### 4. The Court's Conclusions Are Bolstered By Additional Facts and Circumstances

Defendants argue that Loadmaster Universal and Loadmaster Engineering "are separate corporations, with separate owners, separate management, doing different work in different places."[26]  Barnes states in his affidavit that, in addition to being president of Loadmaster Engineering, he is also a shareholder of Loadmaster Universal.[27]  Cuddie, the former vice president of Loadmaster Engineering, was also a shareholder and officer of Loadmaster Universal.[28]  Cuddie's status as a former officer and shareholder of both companies and Barnes' status as a shareholder of both companies are not indicative of the relationship between the two companies.  However, Cuddie's and Barnes' declarations suggest that defendants' assertion that Loadmaster Universal and Loadmaster Engineering have always had "separate owners" and "separate management" is disingenuous.  Loadmaster Universal and Loadmaster Engineering have the same address and share officers and employees.

Loadmaster Engineering's website currently consists of a page redirecting the visitor to Loadmaster Universal's site, for "additional information about Loadmaster Engineering or . . . Loadmaster Universal."[29]  Loadmaster Universal's website describes "Loadmaster['s]" business as "the design and manufacture" of drilling rigs and indicates that it has contributed to operations in "Arctic Alaska."[30]  The page specifically describes a rig that was "designed and constructed for the environmental extremes of the Alaskan

---

[26]Doc. 27 at 2.

[27]Doc. 28-1 ¶ 3.

[28]Doc. 28-2 ¶ 3.

[29]Loadmaster, http://www.loadmastereng.com (last visited Nov. 12, 2010, copy attached).

[30]Introduction, http://www.loadmasterur.com/about2.asp (last visited Nov. 12, 2010, copy attached).

-8-

North Slope."[31]  Other parts of the Loadmaster Universal website refer to Loadmaster Engineering as if the two entities are one in the same.[32]  Doyon's position that Loadmaster Engineering and Loadmaster Universal were "always portrayed . . . as one entity–Loadmaster" is adequately supported.[33]

## B. Defendants Barnes and Cuddie Are Subject to Personal Jurisdiction in Alaska

As a threshold matter, there is substantial conflict amongst the parties' affidavits and declarations regarding the individual defendants' contacts with Alaska.  Although Barnes and Cuddie have both alleged negligible contacts with Alaska, for purposes of determining personal jurisdiction, conflicts in the parties' affidavits must be resolved in Doyon's favor.[34]  Doyon "will have to establish [jurisdictional facts] by a preponderance of the evidence . . . at trial."[35]

### 1. Cuddie and Barnes Are Not Insulated By Their Status As Corporate Officers

The first question is whether actions taken by Barnes and Cuddie on behalf of Loadmaster are properly considered as individual contacts.  This is because–setting aside the individual defendants' ownership interests in Loadmaster–all of their contacts with Alaska appear to have been taken in a corporate capacity.  Defendants argue that "the only important question is whether they availed themselves of Alaska's laws or resources *personally*."[36]  But defendants are mistaken.  In some jurisdictions within the Ninth Circuit, the corporate form "ordinarily will insulate individuals from being subject to

---

[31]*Id.*

[32]*E.g.*, Services, http://www.loadmasterur.com/services.asp (last visited Nov. 12, 2010, copy attached) ("The quality of the Loadmaster Engineering, Inc. product is assured by the partnership between Engineering, Manufacturing, and Quality Control.").

[33]Doc. 33 at 4; *see also* doc. 33-3 ¶ 18.

[34]*Rio Properties, Inc. v. Rio Int's Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002).

[35]*Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1392 (9th Cir. 1984).

[36]Doc. 27 at 10 (emphasis added).

-9-

the court's personal jurisdiction under the so-called fiduciary shield doctrine."[37]  In those jurisdictions, only "where [the] corporation is the *alter ego* of the stockholders so as to justify disregard of the corporate entity [will] jurisdiction over the corporation . . . support jurisdiction over the stockholders."[38]  In Alaska, however, the fiduciary shield doctrine does not apply.[39]  The relevant question is whether a defendant "himself–in whatever capacity he acted–engaged in significant contacts with Alaska."[40]

Defendants argue that "a corporate officer who has contact with a forum only with regard to the performance of his official duties is not subject to personal jurisdiction in that forum."[41]  Defendants' position is supported by the case law, but inapplicable here. The *Forsythe* court, upon which defendants rely, attributes that proposition to another Ninth Circuit decision, *Chem Lab Products, Inc. v. Stepanek*.[42]  In that case, the corporate officer's only contact with the forum state was a communication to the company's attorneys conveying board authorization of a company letter directed to the forum state.  Defendants' contacts here are not of the same ministerial character.

**2. Doyon Has Alleged Contacts Sufficient to Support Specific Jurisdiction**

Doyon has alleged several jurisdictional contacts pertaining to Cuddie.  Cuddie's earliest alleged contact with Alaska was in 1989, when he performed engineering work on the North Slope.  Doyon contends that he lived in Alaska for a period of several

---

[37]4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1069.4 (3d ed. 2002).  *See, e.g.*, *Colt Studio, Inc. v. Badpuppy Enter.*, 75 F. Supp. 2d 1104, 1111 (C.D. Cal. 1999) ("For jurisdictional purposes, the acts of corporate officers and directors in their official capacities are the acts of the corporation exclusively and are thus not material for purposes of establishing minimum contacts as to the individuals.").

[38]*Flynt Distrib. Co.,* 734 F.3d at 1393.

[39]*Cramer v. Wade*, 985 P.2d 467, 472 (Alaska 1999) (holding that "even if [the defendant] could be deemed to have acted exclusively in his corporate capacity, due process would not shield him from suit in his individual capacity").

[40]*Id.*; *see also Calder v. Jones*, 465 U.S. 783, 790 (1984).

[41]*Forsythe v. Overmyer*, 576 F.2d 779, 783–84 (9th Cir. 1978).

[42]554 F.2d 371 (9th Cir. 1977).

-10-

months during that time.[43]  Doyon has alleged that since then, Cuddie undertook continuous and systematic marketing efforts directed at Alaskan companies.  Doyon's allegations suggest that Cuddie has been in consistent contact with Doyon and its competitors, and was primarily responsible for soliciting new business for Loadmaster within Alaska.  Those contacts are relevant to a general jurisdiction inquiry which is unnecessary to undertake here because Cuddie's contacts support the exercise of specific jurisdiction.

The court agrees with Doyon's characterization that alleged misrepresentations forming the basis of Doyon's fraud claims constitute intentional acts for purposes of the *Calder* effects test.[44]  Cuddie purposefully availed himself of jurisdiction in Alaska by making representations to Doyon concerning the Loadmaster entities' capabilities.[45] Those representations provide the basis for Doyon's fraud in the inducement and fraudulent misrepresentation claims.  Doyon has also alleged that Cuddie was personally responsible for the fraudulent billing that forms the basis of a separate fraudulent misrepresentation claim.[46]  Doyon has therefore adequately alleged sufficient contacts to support the exercise of specific jurisdiction.

Barnes' alleged contacts with Alaska are less extensive.  His most significant contacts are negotiation of the Technical Services Agreement, engineering work on Rig 25, and communications with Doyon during performance of the agreement.  Doyon alleges that Barnes "participated in numerous telephone and email communications" once issues arose as to performance of the contract.[47]  Barnes' negotiation of the Technical Services Agreement and any representations made regarding Loadmaster Engineering's capabilities during those negotiations constituted purposeful availment for

---

[43]Doc. 33-2 ¶ 6.

[44]Doc. 33 at 17.

[45]Doc. 12 ¶¶ 11–19.

[46]*See, e.g.*, *id.* ¶ 84.

[47]Doc. 33 at 14.

-11-

purposes of personal jurisdiction in Alaska.[48]  Doyon's fraud in the inducement and

fraudulent misrepresentation claims arise out of those contacts.  As with Cuddie, Doyon

alleges that Barnes was personally responsible for intentionally fraudulent billing.[49]

Doyon's separate fraudulent misrepresentation claim arises out of that allegation.

Doyon has therefore alleged sufficient contacts to support the exercise of specific

jurisdiction over Barnes.

> ### a. The Exercise of Personal Jurisdiction Over Cuddie and Barnes Is Reasonable

The next question is whether exercise of jurisdiction over the individual

defendants would be reasonable.[50]  "Once purposeful availment has been established,

the forum's exercise of jurisdiction is *presumptively reasonable.* To rebut that

presumption, a defendant must present a *compelling* case that the exercise of

jurisdiction would, in fact, be unreasonable."[51]  In determining reasonableness, the court

considers a number of factors: (1) the extent of the defendants' purposeful interjection in

the forum state; (2) the burden on the defendant of defending in the forum; (3) the

extent of the conflict with the sovereignty of defendant's state; (4) the forum state's

interest in adjudicating the dispute; (5) the most efficient judicial resolution of the

controversy; (6) the importance of the forum to the plaintiff's interest in convenient and

effective relief; and (7) the existence of an alternative forum.[52]

On these facts, personal jurisdiction over both Cuddie and Barnes is reasonable.

As discussed above, both individuals purposefully interjected themselves in Alaska, via

contract negotiation, representations to Doyon, and billing practices.  Given the

---

[48]*Id.* at 7.

[49]Doc. 12 ¶ 87.

[50]*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).

[51]*Roth v. Garcia Marquez*, 942 F.2d 617, 625 (9th Cir. 1991) (internal quotations omitted).

[52]*See, e.g.*, *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1269 (9th Cir. 1981).

-12-

magnitude of the project, the extent of that interjection weighs in favor of reasonableness. Defendants argue that the burden of defending a lawsuit in Alaska is "tremendous."[53] Given the individual defendants' positions as officers of Loadmaster Engineering, the court disagrees. The burden on Cuddie and Barnes of defending a lawsuit in Alaska against them personally is no greater than the burden imposed on them by defending a lawsuit in Alaska against Loadmaster Engineering. Loadmaster Engineering contracted to perform a multi-million dollar engineering contract with direct ties to Alaska and, as officers and part owners, Cuddie and Barnes should have been aware of the risk of having to defend a lawsuit there.

Defendants argue that Texas' sovereignty would be compromised. At most, this factor and the next are a wash. Texas' interest in adjudicating this dispute is no greater than Alaska's. While defendants emphasize that the "misconduct alleged . . . all took place in Texas," even if this is so, the alleged injuries were suffered in Alaska.[54] As Doyon points out, Alaska's interest is enhanced by the suit's involvement of an Alaska native corporation, its potential bearing on the Alaskan oil industry, and the simple fact that Alaska is the locus of the designed rig.

With respect to judicial efficiency, defendants argue that "[a]lmost without exception, the witnesses having knowledge and control of information relevant to this dispute . . . will be found in Texas."[55] Doyon maintains that "the majority of the witnesses and evidence are in Alaska."[56] The only sources of potential witnesses mentioned by either party are the various subcontractors. As correctly noted by Doyon, "the most important subcontractors are either Alaskan entities or are located in the Pacific Northwest, closer to Alaska than to Texas."[57] Assuming the number of

---

[53]Doc. 27 at 15.

[54]Doc. 27 at 15.

[55]*Id.* at 16.

[56]Doc. 33 at 24.

[57]*Id.*

-13-

witnesses from Doyon and Loadmaster will be about the same, the proximity to Alaska of subcontractors that might provide additional witnesses tips this factor in favor of a finding of reasonableness.

The next factor is the importance of the chosen forum to the plaintiff's interest in convenient and effective relief. Doyon argues that the District of Alaska "clearly presents the best option for efficient resolution of this case."[58] Defendants argue that, in order for this factor to cut in Doyon's favor, Doyon "must demonstrate that no alternative forum exists."[59] Although Doyon's argument is conclusory, defendants' argument would render the seventh factor nugatory. It is apparent that an Alaskan forum would be important to an Alaska corporation's interest in convenient and effective relief. This factor cuts in favor of reasonableness.

Finally, as defendants have rightly maintained, the Southern District of Texas, which encompasses Houston, would provide a suitable alternative forum. The availability of that forum weighs in defendants' favor. In sum, four factors weigh in favor of a finding of reasonableness, two cut in neither direction, and one factor weighs firmly against a finding of reasonableness. Defendants have not made a compelling case that the exercise of personal jurisdiction over Cuddie and Barnes would be unreasonable.

## C. Defendants' Reliance on *Forum Non Conveniens* Is Misplaced

Defendants' final argument is that Doyon's complaint should be dismissed on the basis of *forum non conveniens*. As Doyon correctly points out, 28 U.S.C. § 1404(a) governs venue transfer in federal court–"[t]he doctrine of *forum non conveniens* survives in federal court only when the alternative forum is in a foreign country."[60] Defendants allege that Texas, not a foreign country, provides a better forum for this action. Although defendants state that their motion is made pursuant to Federal Rules 12(b)(2) and 12(b)(3), they make no mention of § 1404(a) and argue exclusively for dismissal,

---

[58]*Id.*

[59]Doc. 27 at 17.

[60]*Ravelo Monegro v. Rosa*, 211 F.3d 509, 513 (9th Cir. 2000).

-14-

not venue transfer.  The court declines to construe defendants' arguments as a motion for change of venue.

## V.  CONCLUSION

For the foregoing reasons, defendants' motion, pursuant to Federal Rule of Civil Procedure 12(b)(2), to dismiss for lack of personal jurisdiction is **DENIED**.

DATED at Anchorage, Alaska, this 12th day of November 2010.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE



# We are currently revamping our web site.

# If you need additional information about Loadmaster Engineering or about Loadmaster Universal Rigs please click the link below and you will be routed to the web site of Loadmaster Universal Rigs www.loadmasterur.com

# Send Inquiries here

Case 3:10-cv-00094-HRH   Document 45   Filed 11/12/10   Page 16 of 18



## Introduction

Loadmaster has a long history in the design and manufacture of onshore and offshore rigs and rig equipment for operations worldwide, including the USA, Gulf Coast, Arctic Alaska, North Sea, Russia, Papau New Guinea, South America and China. The company has been at the forefront of rig design and has developed and manufactured some of the most innovative, versatile, and cost-efficient drilling rigs to solve conventional as well as unique customer's operating drilling environments.

A limited sample of specific projects and manufactured applications include:

- Fast Moving land drilling rigs to meet current demands in the USA for safe and efficient rig moves
- Highly mobile desert drilling rigs with state of the art drilling equipment and controls
- Helicopter transported drilling rigs for mobilization to remote parts of the world including Papau New Guinea
- Land rig walking systems to efficiently move large capacity masts and substructures between cluster wells, without laying down drillpipe
- Large capacity harsh environment dynamic derricks for deep water semi-submersibles, interfacing the latest rig equipment such as a crown mounted compensator, and an automated pipe racking systems
- Large module derrick barge installed platform rig for the cold temperatures of the Baltic Sea
- Platform crane lift modular rig for efficient batch drilling in Bohai Bay, China
- Winterized drilling module with hydraulic skidding system for land based cluster well drilling in the highly active seismic region of Sakhalin Island, Russia. Arranged "side-saddle" so that mast raising and lowering, and pipe handling is not over completed wells.
- Self propelled two–module cantilevered drilling rig designed and constructed for the environmental extremes of the Alaskan North Slope
- Drilling unit with snubbing capabilities utilizing a hydraulic drawworks traveling within a track system on the back of the mast, operating in the harsh environment of the Norwegian waters of the North Sea
- Vertically assembled masts for modular platform drilling rigs, upgradeable with optional dynamic assist structure for installation on a SPAR or TLP, or on fixed platforms in seismic regions

Let us show you how we can design and manufacture specific drilling rig equipment to solve your unique drilling operations. Or select one of our proven products from the catalogue of existing equipment.

   

HOME  ABOUT US  PROJECTS  SERVICES  PRODUCTS  FACILITIES  CAREER  CONTACT US  LINK

Copyright 2006 Loadmaster Universal Rigs,Inc .All rights reserved
Tel : 001-281-598-7240 Fax : 001-281-598-7339



**Fabrication API 4F**

**Loadmaster Is a Licensed API 4F-Q1 Manufacturer**

The quality of the Loadmaster Engineering, Inc. product is assured by the partnership between Engineering, Manufacturing, and Quality Control. The head of each of these departments has "stop work authority" and will use it as necessary to maintain dimensional tolerances, weld quality, and material properties as specified by design. From purchasing, to painting, to on-site installation support our program assures the quality of the final product.

**When logistics or project** requirements dictate the use of other facilities, our manufacturing quality is not sacrificed. The API 4F-Q1 program established for our facility is carried out in an uncompromising manner. As always manufacturing quality will be assured by our highly experienced on-site Q/A personnel. Our standard non-destructive testing procedures exceed the requirements of API.

**Once our fabrication details hit** the shop floor, our experienced personnel make it happen, using the right equipment for the job. We employ only qualified welders and fitters with manufacturing experience specific to drilling equipment.

 

HOME   ABOUT US   PROJECTS   SERVICES   PRODUCTS   FACILITIES   CAREER   CONTACT US   LINK

Copyright 2006 Loadmaster Universal Rigs,Inc .All rights reserved
Tel : 001-281-598-7240 Fax : 001-281-598-7339

Case 3:10-cv-00094-HRH   Document 45   Filed 11/12/10   Page 18 of 18